UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC WILLIAMS,

      Plaintiff,

v.

VHS OF MICHIGAN,
INC., et al.,

      Defendants.

_____/

Case No. 13-cv-12657
Hon. Matthew F. Leitman

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT (ECF #36)

## INTRODUCTION

Plaintiff Eric Williams ("Williams") brings this action against his former employer, VHS of Michigan, Inc. and VHS Sinai-Grace Hospital, Inc. (collectively, "Sinai-Grace") for quid pro quo sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 *et seq.* ("Title VII"). Williams alleges that after Sinai-Grace terminated his employment for cause, his former supervisor offered to re-hire him in a customer service position in exchange for sexual favors. Sinai-Grace now moves to dismiss and/or for summary judgment. (*See* the "Motion," ECF #36.) For the reasons explained below, the Court grants in part and denies in part Sinai-Grace's Motion.

# FACTUAL BACKGROUND

## A. The Typical Hiring Process at Sinai-Grace

Sinai-Grace is a hospital system in Detroit, Michigan.  When a manager at Sinai-Grace decides to hire a new employee at Williams' level, the hiring process typically works as follows.  First, the manager of the department that seeks to hire a new employee submits a request to the human resources department (the "HR Department").  (*See* Deposition of Employment Specialist Christen Lieb ("Lieb"), ECF #36-4 at 12, Pg. ID 272.)  The HR Department then posts the job on Sinai-Grace's computer system.  (*See id*.)  When an applicant applies for a position, the application is sent to the HR Department.  (*See id.* at 21, Pg. ID 274.)  A representative of the HR Department then screens the applications to eliminate unqualified candidates who lack the minimum qualifications for the position.  (*See* Deposition of Administrative Director of Patient Care Services Stacey Clark ("Clark"), Vol. 2, ECF #40 at 37; Pg. ID 457.)  The HR Department then forwards the applications of qualified candidates to the manager in charge of the position.  (*See id.* at 26; Pg. ID 275.)  From there, the manager reviews the applications forwarded by the HR Department and decides which candidates to interview and, ultimately, whom to hire.  (*See* Deposition of Administrative Director of Patient Care Services Stacey Clark ("Clark"), Vol. 2, ECF #40 at 37; Pg. ID 457.)  Thus,

under the typical hiring process, an applicant is not hired unless and until the HR Department screens his application and sends it to the hiring manager.

**B. Sinai-Grace Hires Williams in 2011 Through an Atypical Hiring Process and Then Fires Him Shortly Thereafter**

In late 2011, Williams applied to work for Sinai-Grace as an information clerk. (*See* Williams Dep. Vol. 1, ECF #36-2 at 102, Pg. ID 204; Clark Dep. Vol. 2 at 25-26, Pg. ID 456.) After submitting his application, Williams learned that the manager for the position was Stacey Clark ("Clark"), whom he had previously met. (*See* Williams Dep. Vol. 1 at 49-51, 102; Pg. ID 197-98, 204.) Williams contacted Clark to inquire about the position. (*See id.* at 102, Pg. ID 204.) At that time, Clark did not have Williams' application, as Arlinda Dobbins ("Dobbins"), the HR Department representative in charge of the position, was still "in the process of selecting candidates for" Clark and had not sent Williams' application to her. (Clark Dep. Vol. 2 at 25; Pg. ID 456.) Therefore, Clark called Dobbins and "asked … if [Dobbins] could forward" Williams' application. (*Id.*) As requested, Dobbins sent Williams' application to Clark, and Clark ultimately interviewed and decided to hire Williams (the "Initial Hiring"). (*See id.* at 24-26, Pg. ID 456.) This hiring of Williams was atypical in that Clark obtained Williams' application and hired him even though the HR Department had not independently forwarded his resume for an interview and possible hiring.

3

Williams' employment at Sinai-Grace did not last long.  Soon after starting the information clerk job, Williams had an altercation with a patient's family member.  (*See* Clark Dep. Vol. 1, ECF #36-3 at 26-27, Pg. ID 232-33; Resp. Br., ECF #37 at 3, Pg. ID 389.)  Clark learned of the incident, consulted with her supervisor and the HR Department, and decided to terminate Williams' employment on or about April 30, 2012. (*See* Clark Dep. Vol. 1 at 26-27, 31-32, 63, Pg. ID 232-33, 236-37, 256; Williams Dep. Vol. 1 at 119-21, Pg. ID 208.)

## C. The First Alleged Quid Pro Quo Harassment and Non-Hiring of Williams

Clark called Williams on May 7, 2012 – approximately a week after firing him (the "May 7th Conversation").  (*See* Williams Dep. Vol. 1 at 122, Pg. ID 208; Clark Dep. Vol. 1 at 64, 68, Pg. ID 257, 261; Call Log, ECF #36-11 at 3, Pg. ID 313.)  According to Williams, Clark apologized for firing him and told him to "n[o]t worry about it" because she "ha[d] something" for him:  a new "position coming up" in her department.  (Williams Dep. Vol. 1 at 122, 127; Pg. ID 208, 210.)[1]  Clark then asked Williams what he was wearing, and she complemented the way he dressed.  (*See id.*)  According to Williams:

---

[1]  Clark disputes the content of the May 7th Conversation and a subsequent telephone conversation she had with Williams on October 3, 2012.  (*See* Clark Dep. Vol. 2 at 68, 70; Pg. ID 461.)  However, on summary judgment, the Court must view Williams' allegations in the light most favorable to him.  The Court takes the facts described herein as true for the purposes of this Motion only.

4

> Then [Clark] said, "Well, this opportunity is here for you.  Do you
> want it?"  [Williams] said yes, and [Clark] said, "Well, what do you
> want to do?"  [Williams] said, "What do you mean by that?"  [Clark]
> said … "Are you going to give me some dick?"

(*Id.* at 125-26, Pg. ID 209.)  Williams refused Clark's sexual advances, told Clark

not to "call [him] with that type of B.S.," and hung up the phone.  (*Id.*)

At some point shortly after the May 7th Conversation, the Sinai-Grace HR

Department formally posted the new position to which Clark had referred during

the call (the "May Job Posting").  On May 15, 2012, Williams applied for the

position.  (*See* Williams Dep. Vol. 1 at 128, Pg. ID 210; Application Tracker at 6,

Pg. ID 330.)  Importantly, Clark was not aware that Williams had applied and did

not become aware of his application at any point during the hiring process.  (*See*

Clark Dep. Vol. 2 at 42; Pg. ID 458.)

Consistent with Sinai-Grace's standard hiring practices for a position at this

level, Williams' application was not sent directly to Clark, the manager for the

position.  Instead, Williams' application first went to the HR Department for a

determination as to whether Williams was qualified for the position and whether

his application should be forwarded to Clark for consideration.  (*See* Lieb Dep. at

26, 33; Pg. ID 275, 276.)  Employment Specialist Lieb from the HR Department

screened the applications for the May Job Posting.  (*See id*.)  In light of Williams'

prior termination from Sinai-Grace, Lieb did not forward Williams' application to

Clark.  (*See id.* at 32-33; Pg. ID 276-77; Clark Dep. Vol. 2 at 42; Pg. ID 458.)

5

Clark ultimately hired another candidate – one whose application had been forwarded by Lieb. (*See id.* at 45; Pg. ID 459.)

### D. The Second Alleged Quid Pro Quo Harassment and Non-Hiring of Williams

Several months later, in September 2012, Clark requested that the HR Department post a vacancy for a customer service position within her department (the "September Job Posting"). (*See* Job Requisition, ECF #36-17, Pg. ID 346.) Williams applied for the position on October 2, 2012. (*See* Application Tracker at 5, Pg. ID 329.)[2] The following day, October 3, 2012, Clark called Williams (the "October 3rd Conversation"). (*See* Call Log, ECF #36-11 at 4, Pg. ID 314.) Clark told Williams that she saw that he had applied for the September Job Posting.[3] (*See* Williams Dep. Vol. 1 at 149; Pg. ID 215.) Clark then asked Williams, "What are you willing to do for this job?" (*Id.* at 145, Pg. ID 214.) Williams asked Clark what she meant. (*See id.* at 148; Pg. ID 215.) Clark responded, "Are you going to

---

[2]  In fact, it appears that Williams applied – and was rejected – for approximately 13 jobs at Sinai-Grace between the time he was terminated and the September Job Posting. (*See* Application Tracker at 5-6, Pg. ID 329-330.) However, the May and September Job Postings are the only vacancies at issue in this action.

[3]  Clark admits that she called Williams on October 3 but denies the content of the conversation as reported by Williams. (*See* Clark Dep. Vol. 1 at 70; Pg. ID 263.) Clark contends that her phone inadvertently dialed Williams while the phone was in her pocket and that she said nothing during the call. (*See id.*)

give me some?"  (*Id.*)  Williams again refused Clark's advances, said "a few choice words" in response, and "just hung up the phone."  (*Id.*)

Sinai-Grace made little progress toward filling the customer service position listed in the September Job Posting.  At the time the position was posted, Sinai-Grace had an acute need for additional nurses, and, accordingly, Clark's supervisor, Elmira Nixon ("Nixon"), "directed … Clark to specifically focus all of her interviewing and hiring between September and December 2012 on nurses." (Nixon Aff., ECF #36-9 at ¶5.)  After receiving Nixon's direction, Clark "put [the vacant customer service position] on the back burner" to focus on "fill[ing] … nursing positions…."  (Clark Dep. Vol. 2 at 47-48, Pg. ID 460.)  Nonetheless, Clark acknowledges that she "may have interviewed one or two" candidates for the September Job Posting, but those candidates "weren't a good fit for the position." (Clark Dep. Vol. 2 at 49; Pg. 460.)  The HR Department ultimately closed the September Job Posting on January 28, 2013, without having filled the position. (*See* Job Requisition at 2, Pg. ID 347.)

## **PROCEDURAL HISTORY**

Williams filed the instant action in this Court on June 17, 2013.  (*See* Compl., ECF #1.)  In his First Amended Complaint, Williams alleges that "Clark's offer to give [Williams] employment with [Sinai-Grace] in exchange for sexual

favors" violated Title VII.  (First Am. Compl., ECF #2 at ¶24.)[4]  Sinai-Grace has

now moved to dismiss and/or for summary judgment.  (*See* the Motion.)  The

Court heard oral argument on the Motion on August 11, 2014.  The parties have

presented, and the Court has considered, voluminous deposition testimony and

other matters outside of the pleadings.  Accordingly, the Court will treat the

Motion as one for summary judgment.  *See* Fed. R. Civ. P. 12(d).

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no

genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services,*

*Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 251–52 (1986)) (quotations omitted). "The mere existence of a

scintilla of evidence in support of the [non-moving party's] position will be

insufficient; there must be evidence on which the jury could reasonably find for

[that party]." *Anderson,* 477 U.S. at 252.  However, summary judgment is not

appropriate when "the evidence presents a sufficient disagreement to require

submission to a jury." *Id.* at 251-252.  When reviewing the record, "the court must

---

[4]   Williams' First Amended Complaint also contained an apparent Title VII
retaliation claim.  (*See id.* at ¶25.)  However, Williams has since clarified that he is
not pursuing a cause of action for retaliation.  (*See* Resp. Br. at 1, n. 1; Pg. ID 387.)
To the extent that Williams' First Amended Complaint contained a retaliation
claim, the Court considers this claim abandoned.

view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

### A. Legal Standard Governing Williams' Claim and The Parties' Positions

Williams acknowledges that in order to prevail under a "quid pro quo" theory of sexual harassment, he must show:

> (1) he was a member of a protected class; (2) he was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; (4) his refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) respondeat superior liability.

(Resp. Br. at 6, Pg. ID 392) (citing *Highlander v. KFC Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986)). Sinai-Grace does not contest the first three elements of this test for the purposes of the Motion. (*See* Motion at 15, Pg. ID 177.) However, Sinai-Grace argues that Williams has not demonstrated a genuine issue of material fact with respect to the fourth and fifth elements. (*See* Motion at 15, Pg. ID 177.)

"To satisfy the fourth element [Williams] must establish: (1) a tangible employment action or detriment; and (2) a causal relationship between the tangible employment action and [Clark's] alleged actions." *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed. App'x 587, 598 (6th Cir. 2009) (citing *Howington v.*

9

*Quality Rest. Concepts, LLC*, 298 Fed. App'x 436, 442-43 (6th Cir. 2008)). The test for the fifth element (i.e., respondeat superior liability) is similar. *See, e.g.*, *Howington*, 298 Fed. App'x at 443, n.7 (respondeat superior liability under Title VII exists when supervisor's harassment "culminates in" a tangible employment action).

In this case, Sinai-Grace's decision not to hire Williams for either the May or September Job Postings was a tangible employment action. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as *hiring*….") (emphasis added). Therefore, the critical issue for purposes of Sinai-Grace's Motion is whether there was a causal relationship between Clark's unwelcome advances and Sinai-Grace's decision not to hire Williams for the May or September Job Postings (the "non-hires"). "[A] causal relationship between refusal of sexual advances and an adverse employment action [is] not established when the alleged … harasser had no formal role in" taking the tangible employment action. *Sanford*, 327 Fed. App'x at 598 (citing *Idusuyi v. State of Tennessee Dept. of Children's Svcs.*, 30 Fed. App'x 398, 401 (6th Cir. 2002)).

Sinai-Grace argues that Williams cannot establish the requisite causal connection because Clark played no formal role in the non-hires. (*See* Motion at 16-17, Pg. ID 178-79.) Specifically, Sinai-Grace maintains that Williams was not

hired for the May Job Posting because Lieb chose not to forward Williams' application as part of the organization's standard screening process. (*See id.* at 16; Pg. ID 178.) Sinai-Grace argues that Lieb's decision not to forward Williams' application to Clark precluded Clark from hiring Williams for the May Job Posting. (*See* Reply Br., ECF #42 at 9, Pg. ID 486.)

Sinai-Grace contends that Williams was not hired for the September Job Posting because Nixon's instruction to Clark to focus her hiring efforts *solely* on nurses precluded Clark from hiring Williams (or anyone else, for that matter) for the vacant customer service position. (*See* Motion at 16-17, Pg. ID 178-79.) Thus, Sinai-Grace contends that Lieb's and Nixon's independent actions negate any causal connection between Williams' rejection of Clark's alleged unwelcome advances and Williams' non-hire.

Williams responds that he has presented evidence from which a reasonable jury could infer a causal connection between his refusal of Clark's advances and both of his non-hires. Williams argues that the evidence, taken in the light most favorable to him, establishes that Clark *could have* hired Williams for either the May or September Postings and that she declined to exercise her authority to do so because he rebuffed her sexual advances. (*See* Resp. Br. at 9-11; Pg. ID 440-42.)

As support for his argument that Clark had the independent ability to hire him, Williams points to his Initial Hiring into the information clerk position in

11

2011.  Williams highlights that Clark reached out to the HR Department, obtained his application and hired him – all without the HR Department having made the affirmative decision to forward his application for consideration.  Simply put, Williams argues that his Initial Hiring shows that Clark could intervene in the HR Department's screening process at her discretion, could bypass the HR Department's screening process, and that she could have hired Williams for the May or September Job Postings.  Williams thus argues that there is a genuine issue of material fact as to whether Williams' refusal of Clark's advances resulted in his non-hire.  (*See id.*)

## B. Williams Has Not Created a Material Factual Dispute as to Whether His Rejection of Clark's Advances Resulted in His Non-Hire for the May Job Posting

Williams has not demonstrated a causal connection between his rejection of Clark's advances and his non-hire for the May Job Posting because the evidence, even taken in the light most favorable to Williams, indicates that his non-hire was attributable to Lieb's screening decision and not to any action by Clark.  Lieb did not include Williams' application among those she forwarded to Clark because of Williams' previous termination from Sinai-Grace.  (*See* Lieb Dep. at 32-33, Pg. ID 276-77; Clark Dep. Vol. 2 at 42; Pg. ID 458.)  Critically, Clark could not have bypassed Lieb's screening process and requested that Williams' application be sent directly to her because *Clark did not even know that Williams had applied for the*

*position*.[5]  Thus, the May Job Posting did not present a situation – like that created in connection with the Initial Hiring – in which Clark arguably had the ability to proactively request that the HR Department forward Williams' application to her.

Clark's lack of knowledge that Williams applied for the May Job Posting sharply distinguishes that posting from the Initial Hiring.  With respect to the Initial Hiring, Clark knew that Williams had applied for the information clerk position because he "reach[ed] out to" her *after* he applied.  (Clark Dep. Vol. 2 at 25, Pg. ID 456.)  With respect to the May Job Posting, Williams told Clark he was interested in the position before it was posted, but he did not tell Clark that he was going to apply; he did not contact Clark after applying to inform her that he *had* applied; and he did not ask Clark to obtain his application from the HR Department.  Simply put, Williams has failed to demonstrate how Clark could have possibly caused Williams' non-hire for the May Job Posting in light of the undisputed facts that (1) she did not know that he had applied and (2) Lieb did not send his application to Clark for consideration.   Because Williams has not demonstrated a causal connection, Sinai-Grace is entitled to summary judgment on that portion of William's quid pro quo claim that is based upon the May Job Posting.

---

[5]  During oral argument before the Court, Williams acknowledged that he has no evidence that Clark knew he had applied for the May Job Posting.

**C. Williams Has Created a Material Factual Dispute as to Whether His Rejection of Clark's Advances Resulted in Williams' Non-Hire for the September Job Posting**

Williams has established a genuine issue of material fact as to whether there was a causal connection between his rejection of Clark's advances and his non-hire for the September Job Posting.  In contrast to the May Job Posting, Clark *was* aware that Williams applied for the September Job Posting.  Indeed, she started the October 3rd Conversation by saying, "I see[] that you applied for the job."  (*See* Williams Dep. Vol. 1 at 149; Pg. ID 215.)  Furthermore, there is no evidence in the record that the HR Department determined that Williams was unqualified for the September Job Posting.  (*See* Dobbins Dep. at 25, Pg. ID 297.)[6]  Thus, based on the current record, it appears that the September Job Posting was analogous to the Initial Hiring.  In each case, Clark knew that Williams had applied for the position, and there is no evidence that the HR Department had disqualified Williams from consideration.  Thus, taking the evidence in the light most favorable to Williams, it

---

[6]  Clark testified that the HR Department performed its screening and sent a pool of candidates to Clark.  (*See* Clark Dep. Vol. 1 at 49, Pg. ID 247.)  However, Clark was not asked at her deposition whether Williams' application was among the applications she was sent.  (*See id.*)  Furthermore, HR Department representative Dobbins testified that she did not "recall that [Clark] was sent applicants" for the September Job Posting (Dobbins Dep. at 25, Pg. ID 297), and Sinai-Grace's application tracking system contains no record of the HR Department having screened Williams' application (*see* Application Tracker at 5; Pg. ID 329).  Taken in the light most favorable to Williams, the Court must view these statements as evidence that the HR Department did not disqualify Williams' application for the September Job Posting.

14

appears that Clark *could have* intervened in the screening process, requested that Williams' application be forwarded to her, and ultimately hired Williams for the September Job Posting – just as she did in the Initial Hiring.

Sinai-Grace resists this conclusion by pointing to the direction that Clark received from her supervisor, Nixon, in late 2012, to focus on hiring *solely* nurses. Sinai-Grace argues that given this direct order from her supervisor, Clark could not have hired Williams for the September Job Posting.  However, Nixon directed Clark to focus on interviewing and hiring nurses "between September and *December 2012*," (Nixon Aff., ECF #36-9 at ¶5) (emphasis added), and the HR Department did not cancel the September Job Posting until January 28, 2013.  (*See* Job Requisition at 2, Pg. ID 347.)  Thus, for the full month of January 2013, the September Job Posting was open, and there is no evidence that Clark was subject to any directive *not* to interview or hire for that position.  Moreover, Clark testified that despite Nixon's directive she "may have interviewed one or two" candidates for the position.  (Clark Dep. Vol. 2 at 49; Pg. ID 460.)  Taken in the light most favorable to Williams, the Court must interpret this testimony to mean that Clark *did* take steps toward hiring for the September Job Posting and, therefore, *could have* hired Williams – at the very least during January of 2013 when she was not subject to a direction not to hire and while the position remained posted.

15

In sum, Williams has presented evidence from which a jury could reasonably find a causal connection between Clark's alleged unwelcome advances and Williams' non-hire for the September Job Posting.   Accordingly, Sinai-Grace is not entitled to summary judgment as to the September Job Posting.

## <u>CONCLUSION</u>

For all of the reasons in stated in this Opinion and Order, **IT IS HEREBY ORDERED THAT** Sinai-Grace's Motion to Dismiss and/or For Summary Judgment (ECF #36) is **GRANTED** as to the May Job Posting and **DENIED** as to the September Job Posting.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 29, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

16